# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2791

KEVIN C. CARTER,

*Plaintiff-Appellant,*

v.

TENNANT COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 1925—**Harry D. Leinenweber**, *Judge.*

———————

ARGUED JANUARY 6, 2004—DECIDED SEPTEMBER 13, 2004

———————

Before EASTERBROOK, DIANE P. WOOD, and WILLIAMS,
*Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* As Kevin Carter discovered in this case, it rarely pays to lie. In applying for a position with Tennant Company, Carter completed a "Health History Questionnaire" that inquired about his prior work-related injuries and medical care. Carter failed to report a back injury from an earlier job, an omission that Tennant discovered when Carter filed for workers' compensation benefits after "re-aggravating" the injury while working for Tennant. Shortly thereafter, Tennant dismissed Carter.

Carter sued, alleging both that Tennant had discharged him in retaliation for making his workers' compensation claims and that Tennant's health history questionnaire violated Illinois's Right to Privacy in the Workplace Act (Privacy Act), 820 ILCS 55/1 *et seq.* The district court granted summary judgment for Tennant with respect to both of Carter's claims. We affirm.

**I**

From August 1998 until April 1999, Carter served as a part-time custodian for Gurnee School District 56. On November 30, 1998, Carter injured his back while at work and filed a workers' compensation claim. Carter's workers' compensation benefits paid for frequent chiropractic treatments for his injury. In April 1999, Carter resigned from his position with Gurnee to accept a full-time position with Tennant. As part of the application process for the Tennant position, Carter was required to complete and sign a health history questionnaire. The questionnaire first asked Carter to identify and explain any health conditions that he had suffered. Carter answered: "Back/neck trouble—slight misalignment of vertebrae; corrected by chiropractic adjustment." Carter then answered in the affirmative the following three questions: "Have you ever had any occupational injuries, accidents or illnesses?"; "Did you lose time from work for a work-related injury or illness? List injuries/illnesses, date occurred and company worked for at the time . . . ."; and "Did you see a medical doctor for any work-related injury/illness?" In answering the second question, Carter wrote only: "Hair caught on motor shaft, resulting in swelling of scalp and face." In response to the third question, he answered, "Saw doctor for above incident." At the conclusion of the questionnaire, Carter signed below the following statement: "I hereby certify that I have answered the above

questions to the best of my knowledge and that the answers are complete and true. Any misrepresentation or omission may be justification for refusal of employment, or if employed, termination of employment." As Carter acknowledges on appeal, he "did not tell Tennant about his Gurnee injury or on-going medical care and benefits when he completed the questionnaire."

Tennant hired Carter on April 26, 1999. Carter continued to receive workers' compensation benefits for his Gurnee injury until September 15, 1999, when he failed to attend a mandatory medical examination. Two weeks later, on September 28, 1999, Carter informed his Tennant supervisor that he had injured his back while working at a customer site. He immediately sought treatment from his regular chiropractor, Dr. Jeffrey Watkin. The next day, Dr. Watkin submitted a Workers' Compensation Attending Physician's Supplement Report to Tennant, in which he described the injury as lower back pain "reaggravated at work" and listed the date of the injury as November 30, 1998, the date on which Carter injured his back while at Gurnee. On November 9, 1999, Tennant's workers' compensation carrier informed the company that it was denying Carter's workers' compensation claim because he had filed a prior claim with Gurnee for his back injury and was receiving treatment for this injury. Carter continued to work for Tennant following his injury and the denial of his workers' compensation claim, during which time he received positive evaluations, as well as a retroactive merit salary increase.

Some time after November 10, 1999, Tennant's Disability Council met to consider Carter's case. According to Tennant, "[t]he purposes of the Disability Council were to analyze the types of workplace injuries which occurred, in an effort to reduce the occurrence of workplace injuries by developing training; to develop back-to-work plans for injured employees; to assist employees in resuming their regular duties;

and to formulate specific action plans for individual employees." The testimony of the Tennant employees who sat on the Disability Council is inconsistent as to whether the Council had final authority to terminate an employee, but there seems to be some consensus that the Council made the decision to discharge Carter. On November 30, Carter's supervisors informed him that he was being terminated effective December 1, 1999.

On January 29, 2001, Carter filed a complaint with the Illinois Department of Labor alleging that Tennant's health history questionnaire violated Section 10 of the Privacy Act. After a hearing, the Administrative Law Judge issued a notice stating: "Please take notice that the Department of Labor has concluded its administration and enforcement of the [Privacy] Act in the above captioned case. The Department will take no further action in this matter. Therefore, pursuant to 820 ILCS 55/15(c), the Complainant has leave to pursue other civil remedies." On February 7, 2002, Carter filed this action in the Circuit Court of Cook County. Carter first raised a retaliatory discharge claim, alleging that Tennant "terminated Plaintiff as a direct consequence of learning of his exercise of his rights as guaranteed under the Illinois Workers' Compensation Act before he became an employee." In addition, he charged that Tennant had violated the Privacy Act by "wilfully and knowingly terminat[ing] Plaintiff's employment based upon its allegations that Plaintiff's failure to provide it with answers to prohibited inquiries constituted falsification of his Health History." Tennant removed the case to the Northern District of Illinois based on federal diversity jurisdiction. On June 16, 2003, the district court granted summary judgment for Tennant on both counts of Carter's complaint. This appeal followed.

## II

## A

We first consider Carter's claim that Tennant illegally discharged him in retaliation for his filing a workers' compensation claim for his back injury. The district court granted Tennant's motion for summary judgment on this claim, a decision that we review *de novo. McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). Under Illinois law, "[a] valid claim for retaliatory discharge requires a showing that (1) an employee has been discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy." *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) (citing *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992)). "In the workers' compensation context, a plaintiff must show (1) that he was the defendant's employee before his injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim." *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 767 (7th Cir. 1994) (citing *Kritzen v. Flender Corp.*, 589 N.E.2d 909, 915 (Ill. App. Ct. 1992)). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein*, 601 N.E.2d at 728. An employee's discharge for filing a workers' compensation claim against her current employer or her prior employer "is equally offensive to the public policy of this State as stated in the Workers' Compensation Act." *Darnell v. Impact Indus., Inc.*, 473 N.E.2d 935, 937 (Ill. 1984).

There is some uncertainty, however, with respect to the applicability of this framework when a retaliatory discharge case "wander[s] into federal court by virtue of . . . diversity jurisdiction." *Bourbon*, 223 F.3d at 474 (Posner, J., concurring); see *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59-

60 (7th Cir. 1990). The alternative would be the burden-shifting method presented in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The latter is appropriate if it merely establishes procedures for federal courts to use in adjudicating cases; the state-law approach is required if it is substantive.

This is of potential importance because "the Supreme Court of Illinois expressly rejected the application of *McDonnell Douglas* to Illinois retaliatory-discharge cases in *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407-08 (Ill. 1998)." *Bourbon*, 223 F.3d at 474 (Posner, J., concurring). The Illinois court was concerned that use of the *McDonnell Douglas* framework "would, in essence, expand the tort of retaliatory discharge by reducing plaintiff's burden of proving the elements of the tort." *Clemons*, 704 N.E.2d at 408. Application of *McDonnell Douglas*, it thought, would relieve plaintiffs of their burden to prove as an element of their *prima facie* case under Illinois law a causal link between their workers' compensation claims and their discharge. *Id.*

Despite the substantive tone of the Illinois court's comments, this court has previously stated that "Illinois retaliatory discharge cases brought in federal court may be analyzed using the burden-shifting method presented in *McDonnell Douglas*," rather than the approach outlined by the Illinois courts. *Id.* at 473 (citing *Hiatt*, 26 F.3d at 767). The Supreme Court has repeatedly emphasized that the plaintiff bears the ultimate burden of persuasion throughout the burden-shifting process. See, *e.g.*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As we noted in *McEwen, supra*, this implies that *McDonnell Douglas* merely structures a procedure. And that procedure is by now very well-known. "To establish a *prima facie* case using this method, [the plaintiff] must show that he was in a protected class, that he was performing his job satisfactorily, that he was nevertheless the subject of a materially

adverse employment action, and that others outside the class were treated more favorably." *Id.* If a plaintiff makes out a *prima facie* case, the employer "must then articulate a legitimate, non-discriminatory reason for his termination. The burden then shifts back to [the plaintiff] to show that [the employer's] proffered reason is nothing more than a pretext for unlawful discrimination." *Id.*

Although "[s]omeday we'll have to decide what the *prima facie* case of retaliation is in the Seventh Circuit," *Bourbon*, 223 F.3d at 476 (Posner, J., concurring), this is not the moment of truth. First, as in *Bourbon*, the question whether the Illinois standard or the *McDonnell Douglas* standard should control was "ignored by the parties, hence waived" on appeal. *Id.* at 473. Second, under either standard, Carter loses if Tennant can provide a valid, non-pretextual reason for its decision to terminate Carter. We agree with the district court that Tennant has provided such a reason. Tennant has consistently argued that it discharged Carter not because he filed a workers' compensation claim, but because he falsified his answers on the health questionnaire when he failed to report his Gurnee back injury despite being asked whether he had suffered any occupational injuries. Tennant's decision to terminate Carter on this basis is consistent with the questionnaire's warning that "[a]ny misrepresentation or omission may be justification for refusal of employment, or if employed, termination of employment," as well as Tennant's employee manual, which cautions that "[p]roviding false or misleading information in personnel records, time cards, *information about injuries*, or other company records or documents" may lead to "suspension and disciplinary action, up to and/or including termination."

While Carter concedes that he failed to report his Gurnee injury on the questionnaire, he nonetheless argues that his discharge was impermissible because Tennant's proffered explanation for his termination was pretextual. He has three arguments in support of this position. First, he

suggests that the timing of Tennant's discovery of Carter's workers' compensation claims and its decision to fire him shows that his discharge was retaliatory. Carter points to three relevant dates: on or about September 29, 1999, he filed his Tennant workers' compensation claim; on November 9, 1999, Tennant learned of his back injury and his Gurnee workers' compensation claim for the first time; and sometime between November 10 and November 30, 1999, the Disability Council decided to terminate him. Carter has waived this argument, however, because he presented it for the first time in his reply brief. See *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002). Moreover, nothing in this sequence of events helps us to distinguish between a discharge for filing workers' compensation claims and a discharge for a dishonest omission on the questionnaire.

Next, Carter argues that the deposition of Ryan Rebman, Chair of Tennant's Disability Council, provides direct evidence that Carter was terminated because of his workers' compensation claims. When asked why Tennant discharged Carter, Rebman stated: "[M]y understanding is his termination is because of filing a work comp claim." Rebman then went on to explain: "In my judgment, he didn't talk about his . . . being treated for work comp injury while employed at Tennant Company." Rebman's comments are subject to several interpretations, given that Tennant learned of Carter's preexisting back injury and his Gurnee workers' compensation claim at the same time. It is therefore just as likely that Rebman meant that Tennant terminated Carter because he failed to report his prior *injury*, rather than his prior workers' compensation claim. Thus, Rebman's statement does not establish that Tennant's explanation for its decision to discharge Carter was pretextual. Finally, Carter argues that Tennant admitted that it terminated him because of his workers' compensation claims when it stated in a filing to the district court: "Rebman's testimony, whether

corrected or not, refers only to Carter's claim against Gurnee." But this is disingenuous; the very next sentence in that filing says, "Thus, Rebman's testimony . . . suggests only that Rebman believed Carter's termination resulted in part from issues arising from his undisclosed, pre-Tennant injury." Read together, these statements support Tennant's proffered explanation for its decision to fire Carter.

Carter next argues that, even if Tennant's explanation is non-pretextual, Tennant should not be allowed to avoid liability on his retaliatory discharge claim because its questionnaire illegally required him to disclose whether he had received workers' compensation. But the Illinois Supreme Court's decision in *Darnell* shows that the two laws (the Privacy Act and the workers' compensation law) do not work together in that way. In *Darnell*, the court had to decide whether Impact Industries impermissibly terminated Darnell for lying on her employment application. The application required Darnell to state whether she "had a serious illness or injury in the past 5 years" and whether she had "ever received compensation for injuries." 473 N.E.2d at 936. She answered both questions in the negative. *Id.* After Impact Industries learned that she had filed a workers' compensation claim for injuries sustained at her previous job, it terminated her, and she filed a retaliatory discharge claim. *Id.* The majority held that the circuit court erred in directing a verdict for Impact Industries because there was some evidence suggesting that it had fired her because she had received workers' compensation. *Id.* at 937. In his concurrence, which joined the opinion and concurred in the result, and thereby provided the deciding vote in favor of the majority position, Justice Simon emphasized that the "opinion does not suggest, however, much less hold, that the defendant could not have discharged the plaintiff for dishonesty if it demonstrated, as it contends was the case, that she had lied on her application." *Id.* at 937-38 (Simon, J. concurring). Following this reasoning, we hold that

Carter cannot prevail on his retaliatory discharge claim simply because he was required to answer questions that may be invalid under Illinois law. Carter did not decline to answer Tennant's questions, as he might have done if he had thought they were impermissible. He answered them dishonestly, and this provides a valid, non-pretextual reason for Tennant's decision to discharge him. We therefore affirm the district court's grant of summary judgment to Tennant on Carter's retaliatory discharge claim.

**B**

We now turn to Carter's Privacy Act claim. Initially, we address our jurisdiction over this claim. As we noted earlier, Carter began this litigation in state court, and Tennant removed it to federal court in reliance on the diversity jurisdiction. See 28 U.S.C. § 1332. The two parties are citizens of different states: Carter is an Illinois citizen and Tennant is incorporated in Minnesota and has its principal place of business there. The amount in controversy was also satisfied at the outset of the suit, taking both of Carter's claims against Tennant into account. See FED. R. CIV. P. 18(a). For his retaliatory discharge claim, he sought compensatory damages for the loss of his job and associated pain, suffering, and emotional distress, and punitive damages of at least $100,000; for his Privacy Act claim, he asked for unspecified actual damages including pain, suffering, and emotional distress, $200 because the violation of the Act was wilful and knowing, and further relief in the court's discretion. Although the $75,000 jurisdictional amount was easily met by aggregating both claims, as the law permits, see *Snyder v. Harris*, 394 U.S. 332, 335 (1969), once the retaliatory discharge claim disappeared a claim arguably worth less than $75,000 was all that remained.

There is a conflict in the circuits on the way to handle this situation. The Second Circuit takes the position that the

propriety of diversity jurisdiction must be assessed at the outset of the case, and that later changes—even in something like the amount in controversy—do not operate to strip the court of jurisdiction. See *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 62 (2d Cir. 1999). The Fourth Circuit, in contrast, takes the position that if dismissal of some claims has the effect of bringing the aggregate amount in controversy below the required level, then the court has only supplemental jurisdiction over the remaining claim(s) and it must exercise its discretion as directed by 28 U.S.C. § 1367(c) in deciding whether to retain the remaining claims or to dismiss them (or, in the case of removals, to remand them to state court). *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995).

This court has already questioned whether the approach of *Shanaghan* is consistent with the diversity statute and the rules permitting a single plaintiff to aggregate all of her claims. *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1121 (7th Cir. 1998). See also *Johnson v. Wattenbarger*, 361 F.3d 991 (7th Cir. 2004). We hold today that it is not. The Second Circuit's *Wolde-Meskel* opinion explains thoroughly why aggregated claims of a single plaintiff do not fit the supplemental jurisdiction model. We add only the following observations. First, the diversity statute itself, 28 U.S.C. § 1332, already provides for the situation in which a plaintiff ultimately recovers less than the jurisdictional amount. See § 1332(b). While that section addresses what happens once that recovery has been awarded, it necessarily implies that jurisdiction continues to exist once the possibility of such a result manifests itself. In any case with aggregated claims, success on less than all of the claims may easily lead to a judgment of less than the jurisdictional amount. We held in *Johnson, supra*, that a district court could not dismiss a claim for failure to meet the jurisdictional amount after it had disposed of other claims on the

merits. 361 F.3d at 993. The same approach is appropriate here. The district court had jurisdiction over Carter's Privacy Act claim, and we must therefore decide whether it was properly dismissed.

The relevant section of Illinois's Right to Privacy in the Workplace Act provides as follows:

> Prohibited inquiries. It shall be unlawful for any employer to inquire, in a written application or in any other manner, of any prospective employee or of the prospective employee's previous employers, whether that prospective employee has ever filed a claim for benefits under the Workers' Compensation Act or Workers' Occupational Diseases Act or received benefits under these Acts.

820 ILCS 55/10. Carter alleges that Tennant's questions regarding whether he had suffered prior occupational injuries, lost time from work for a work-related injury or illness, or seen a medical doctor for any work-related injury/illness violate this provision of the Privacy Act. The district court denied Carter's claim on two grounds: First, it held that his claim was time-barred under ILL. ADMIN. CODE tit. 56, § 360.120, which provides that complaints under the Privacy Act shall be filed with the Illinois Department of Labor "within 180 days after termination or the complained of incident." Carter filed his complaint with the Illinois Department of Labor more than 600 days after he completed Tennant's health questionnaire and over 400 days after Tennant terminated him. Second, the court held that Carter "has no standing to bring a private cause of action pursuant to section 55/15(c)" of the Privacy Act.

While we do not find either of these arguments to be sound, we agree with the district court's ultimate outcome. We explain briefly why we do not rely on either standing or timeliness of the claim. First, there is simply no problem with Carter's standing to sue. We reiterate that standing

requires "(i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision." *Lee v. City of Chi.*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Carter readily satisfies these criteria, as his Privacy Act claim describes an injury in fact caused by Tennant that could be redressed by a favorable verdict.

We also reject the district court's conclusion that Carter failed to satisfy the requirements set out in Section 15(c) of the Privacy Act as to when an employee may sue to enforce the Act's provisions. Under Section 15(c), an employee may sue "where efforts to resolve the employee's . . . complaint concerning the violation by conference, conciliation or persuasion under subsection (b) have failed and the Department has not commenced an action in circuit court to redress the violation." Tennant asserted below, and the district court agreed, that Carter had "adduce[d] no evidence that the Department of Labor failed to resolve his Complaint." Rather, the court found, "it appears that an agreement was reached between the parties and that the Department of Labor found that the issue had been resolved." On this basis, the court concluded that Carter could not bring his Privacy Act claim.

This conclusion is difficult to square with the Department of Labor's notice to the parties, which is entitled, "Conclusion of Department of Labor Administrative and Enforcement Actions." This notice, which is included in the record, states:

> Please take notice that the Department of Labor has concluded its administration and enforcement of the Act

> in the above captioned case. The Department will take no further action in this matter. Therefore, pursuant to 820 ILCS 55/15(c), the Complainant has leave to pursue other civil remedies.

Had the Department of Labor concluded that Carter failed to satisfy the requirements of Section 15(c), or that the 180-day limitations period provided in ILL. ADMIN. CODE tit. 56, § 360.120 barred his private action, it seems unlikely that it would have issued Carter what is essentially a right-to-sue letter. Indeed, this notice specifies that *pursuant to* Section 15(c), Carter may bring a civil action, indicating that the Act's prerequisites are no barrier to his filing suit. In light of the Department of Labor's notice, as well as the Privacy Act's silence as to the period within which an employee must file a civil action, we conclude that the substance of Carter's Privacy Act claim was properly before the district court.

This brings us to the merits of Carter's claim. Whether Section 10 of the Privacy Act bars the type of inquiries in Tennant's health questionnaire requires an interpretation of state law, and no court in Illinois has addressed this issue. "We therefore determine the question as we predict the Supreme Court of Illinois would if it were deciding the case." *Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004). According to the Illinois Supreme Court, "[t]he primary rule of statutory construction is to ascertain and give effect to the intent of the legislature." *People v. Donoho*, 788 N.E.2d 707, 715 (Ill. 2003). "The best evidence of legislative intent is the statutory language. When possible, the court should interpret the statute according to the plain and ordinary meaning of the language." *Id.*; see also *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The Illinois Supreme Court has made clear that "[i]f the statutory language is clear and unambiguous, then there is no need to resort to other aids of construction." *In re D.L.*, 727 N.E.2d 990, 994 (Ill. 2000). The Illinois Appellate Court has explicitly ap-

plied this approach in interpreting provisions of the Privacy Act. *Hampton v. Vill. of Washburn*, 739 N.E.2d 1019, 1022 (Ill. App. Ct. 2000).

Here, the "plain and ordinary meaning of the statutory language" is clear: Section 10 of the Privacy Act specifically bars employers from inquiring "whether that prospective employee has ever *filed a claim* for benefits under the Workers' Compensation Act or Workers' Occupational Diseases Act or *received benefits* under these Acts." 820 ILCS 55/10 (emphasis added); see also ILL. ADMIN. CODE tit. 56, § 360.100 (1992) (defining the "purpose and scope" of the Privacy Act as "prohibit[ing] employers from making inquiries regarding *claims filed* by prospective employees under the Workers' Compensation Act or the Workers' Occupational Diseases Act" (emphasis added)). Tennant's questionnaire asked nothing about claims filed or benefits received. It inquired only whether Carter "ever had any occupational injuries, accidents, or illnesses"; "los[t] time from work for a work-related injury or illness"; or saw "a medical doctor for any work-related injury/illness." Naturally, as Tennant's counsel conceded at argument, the answers to these questions provide a fairly good clue about who might have previously sought workers' compensation benefits, given the questions' exclusive focus on "occupational" and "work-related" injuries. But the fact remains that the inquiries are different, and that it is conceivable that someone might have suffered a workplace injury and refrained from filing a claim related to it. Most importantly, Illinois's principles of statutory construction direct us first to the language of the statute, which we find to be unambiguous. Had the Illinois legislature wished to bar a wider set of inquiries regarding an employee's work-related medical history through the Privacy Act, it could have done so.

"Our role as a federal appellate court in this diversity action is simply to apply the language of the [Illinois]

statute and to ascertain and give effect to the intent of the [Illinois] legislature. In many diversity cases a court is called upon to construe and apply ambiguous statutory language, the ambiguity compounded by unilluminating or non-existent case law construing the provision. This is not one of those cases." *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1219 (7th Cir. 1984) (internal citation omitted). One can imagine arguments on either side of the question whether to read the Privacy Act broadly, but we are not the right audience for them. As a federal court sitting in diversity and in the absence of any Illinois case law to guide us on this issue, we decline to expand the Act's scope beyond its plain language. To find that Section 10 encompasses questions regarding applicants' prior occupational injuries and the care they received would significantly expand its reach. We therefore hold that Tennant's questionnaire falls outside the scope of the Privacy Act.

### III

For these reasons, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*