In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2417

THOMAS MCCOY,

*Plaintiff-Appellant*,

*v.*

MAYTAG CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 04 C 4099—**James L. Foreman**, *Judge.*

———————

ARGUED FEBRUARY 8, 2007—DECIDED JULY 30, 2007

———————

Before RIPPLE, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Maytag Corporation terminated Thomas McCoy's employment for failing to comply with the notice provision of its collective bargaining agreement after McCoy did not provide a medical update to justify his absence from work after his leave of absence expired. McCoy then sued Maytag, alleging that Maytag terminated him in retaliation for his filing of a workers' compensation claim and that his termination breached the collective bargaining agreement. The district court granted summary judgment to Maytag on both claims. We affirm.

I.

Thomas McCoy was an assembly line employee in Maytag Corporation's ("Maytag") washer and dryer manufacturing facility in Herrin, Illinois. On April 21, 2003, McCoy injured his left shoulder while moving washing machine bases as part of his job duties. McCoy felt something pop in his left shoulder, and then his arm began to go numb and he experienced a tingling sensation.

That same day, McCoy reported the incident to his supervisor, Gordon Dailey. A physician's assistant, Chris Shadowens, examined McCoy that day and diagnosed him as suffering from rotator cuff tendinitis, but he ruled out a tear. Shadowens opined that McCoy was fit to return to light-duty work the next day, with the restriction that McCoy may not use his left arm to lift objects weighing more than five pounds. Later that day McCoy provided Shadowens' written medical evaluation to nurse Kathy LeMay, who worked in Maytag's on-site medical office, which was located within the manufacturing facility. McCoy also testified that in the past he had provided medical documents, such as doctor's notes, both to LeMay and to Maytag's Senior Workers' Compensation Specialist, Marie Brasher. Brasher, unlike LeMay, worked in Maytag's human resources office.

McCoy returned to work the next day. An unidentified doctor then modified Shadowens' prior work limitations to restrict McCoy from using his left arm and stated in his written medical evaluation that McCoy could return to work the next day. McCoy discussed the new restriction with Dailey. Unfortunately for McCoy, Dailey informed him that Maytag had no jobs that could accommodate his restriction. McCoy left work on April 22, 2003, and never returned to work at Maytag.

McCoy testified that at some point shortly thereafter, he had a conversation with LeMay during which he requested "a form to fill out for work comp." According to McCoy, LeMay gave him a Maytag form entitled "Statement of Claim for Accident or Sickness Benefits" ("A&S form").[1] McCoy then completed the A&S form and dated it April 28, 2003. On the form, McCoy indicated that he had been injured at work and that he intended to present a workers' compensation claim. McCoy's personal physician, Edward Corder, M.D., completed the physician portion of McCoy's A&S form and signed and dated it May 7, 2003. Two days later, McCoy sent to Maytag a facsimile of his completed A&S form.[2] McCoy stated that no one at Maytag discouraged him from filing an application for A&S benefits, and he acknowledged that he received A&S benefit payments.

McCoy testified that, at the time he completed the A&S form, he mistakenly believed it was a form to apply for workers' compensation benefits. On the same day that McCoy completed his portion of the A&S form, however, he completed, signed, and dated a separate workers' compensation benefits application at his attorney's office. The record indicates that McCoy filed his workers' compensation claim with the Illinois Industrial Commission,[3] and that Maytag initially disputed McCoy's claim. In May

---

[1] A&S benefits are a twenty-six-week, short-term disability benefit. In order to remain eligible for A&S benefits, the employee is required to submit monthly disability forms attesting to the employee's continued disability.

[2] Based on McCoy's application date his A&S benefits and leave of absence expired on October 21, 2003.

[3] The Illinois Industrial Commission is now known as the Illinois Compensation Division.

2004, McCoy and Maytag ultimately settled his workers' compensation claim for a lump sum payment to McCoy of $8,856.69.

In the months that followed his application for A&S benefits, McCoy stayed in touch with Brasher and provided to her medical evaluations forms completed by his treating physicians indicating the status of his condition and limitations. Some of the documents that McCoy submitted were completed versions of Maytag's own "Health Insurance Claim Group Disability Income" forms ("Maytag forms"), while others were evaluations written on his treating physicians' letterheads. For example, McCoy submitted to Maytag an evaluation from one of his treating orthopedists, William Harryman, M.D., dated August 4, 2003, and written on Dr. Harryman's letterhead, which stated that he was unable to work until after his next evaluation on August 25, 2003.[4] On August 11, 2003, McCoy and Dr. Corder completed, signed, and dated a Maytag form indicating that McCoy remained totally disabled and unable to work. Dr. Harryman re-evaluated McCoy on August 25, 2003, and McCoy testified that he believed that he provided to Maytag another letter on Dr. Harryman's letterhead indicating that McCoy may not return to work until after undergoing surgery.

On September 25, 2003, five months after his injury, Dr. Harryman performed surgery on McCoy's shoulder. In a letter on Dr. Harryman's letterhead and signed by Dr.

---

[4] It is unclear who signed these letters on Dr. Harryman's letterhead, but McCoy testified that Dr. Harryman was his treating orthopedist and the forms were completed at Dr. Harryman's instruction. The letters' veracity is not in question.

Harryman, he stated that McCoy "[m]ay <u>NOT</u> return to work for at least 8 weeks" following his surgery. Both McCoy and Dr. Harryman also completed a Maytag form dated September 29, 2003, indicating that McCoy was presently disabled and unable to work. McCoy testified that Dr. Harryman's office sent to Brasher a facsimile of both of Dr. Harryman's written medical evaluation forms. Maytag acknowledges that it received the forms and that they were kept in its manufacturing facility's medical office. However, neither LeMay nor David Wittenbrink, Maytag's other on-site nurse, received Dr. Harryman's September medical evaluations. Janice McConnaughy, Maytag's Manager of Employee Relations, also testified that she did not know the documents existed and that she never received copies.

It was at that point that the situation became convoluted. Maytag states that it was working under the belief that McCoy had a duty to provide it with status reports regarding his medical condition every thirty days pursuant to Article 13.5 of its collective bargaining agreement ("CBA"). Prior to his surgery, McCoy provided periodic updates within the required thirty-day time frames, and Maytag accordingly paid A&S benefits to McCoy. It is uncontested, however, that following his surgery and submission of Dr. Harryman's medical evaluation forms, McCoy did not provide any further status updates to Maytag for at least thirty days. Based on its interpretation of the CBA, Maytag determined that without any updated status reports, McCoy's A&S benefits and leave of absence expired on October 21, 2003.

LeMay asked McConnaughy to advise McCoy that he

was delinquent in submitting his updated status reports.[5] In a letter dated November 6, 2003, sent via certified mail, McConnaughy informed McCoy that "we have not heard from you or received medical documentation since your leave of absence expired on October 21, 2003." McConnaughy's letter requested that McCoy "submit documentation necessary to support your absence for the past three weeks by 9:00 a.m. on Friday, November, 14, 2003 for us to review to determine your employment status" and warned him that "[i]f we do not hear from you by that date, we will have assumed that you have terminated your employment."

From November 6, 2003, through November 14, 2003, Maytag did not receive a response from McCoy, nor did it receive a certified mail receipt evincing delivery of the letter. On November 14, 2003, McConnaughy sent an e-mail to LeMay and Wittenbrink, asking, "[c]an you please tell me if you received updated medical documentation for Thomas McCoy[,]" as well as "[w]hat address do you have for Thomas?" Wittenbrink responded that he had not received an update from McCoy, and that McCoy had provided "an address different than his original paper-work" on his last continuation form. McConnaughy then sent to McCoy a second letter via certified mail, which

---

[5] Again, neither LeMay nor McConnaughy was aware of Dr. Harryman's written medical evaluations, which Dr. Harryman's office faxed to Brasher on October 3, 2003. However, both testified that they were operating under their understanding of standard Maytag procedures.

was dated November 17, 2003.[6] That letter stated that because Maytag had not heard from McCoy since October 21, 2003, "effective immediately, [his] employment with Maytag [ ] has been terminated. If you can provide documentation to support that you have been reporting your absences to Maytag [ ], please submit them for our review."

On November 20, 2003, McCoy accepted delivery of both of Maytag's certified letters. That same day McCoy contacted his then-attorney, Mark Prince, who in turn contacted Maytag's attorney, Michael Keefe, regarding getting McCoy reinstated. According to McCoy, "nothing came of" Prince's efforts, and McCoy did not speak with anyone at Maytag regarding his termination.[7] McCoy did not, however, contact his union representative or submit any additional documents to Maytag for review for approximately two months. Not until January 15, 2004, did McCoy contact his union representative, Steve Jones, regarding his termination. Jones declined to file a grievance on McCoy's behalf, based on his conclusion that a grievance would have been untimely because it was well past the CBA's forty-eight-hour deadline to file such a grievance.

McCoy filed this lawsuit against Maytag approximately four months later. McCoy alleged that Maytag terminated his employment in retaliation for his exercise of his workers' compensation rights and that Maytag breached the

---

[6] It is unclear whether the second letter was sent to the same address or the new address Wittenbrink provided in his e-mail.

[7] In December 2003, McCoy dismissed attorney Prince and hired attorney Stephen Stone to represent him.

CBA.[8] Following discovery, Maytag moved for summary judgment. The district court granted Maytag's motion. McCoy appeals.

II.

On appeal, McCoy first argues that the district court should not have granted summary judgment in favor of Maytag because Maytag's proffered reason for his discharge—that he failed to provide medical updates—was a pretext. We review the district court's grant of summary judgment de novo. *Clark v. State Farm Mut. Auto. Ins. Co.*, 473 F.3d 708, 712 (7th Cir. 2007). In doing so, we view all facts and draw all inferences in the light most favorable to the non-moving party. *Abstract & Title Guar. Co. v. Chicago Ins. Co.*, ___ F.3d ___, 2007 WL 1598099, at *2 (7th Cir. June 5, 2007). "Summary judgment is appropriate where the evidence before the court indicates that there are no

---

[8] McCoy's retaliatory discharge claim invoked the district court's diversity jurisdiction. *See generally Monroe v. Mo. Pac. R.R. Co.*, 115 F.3d 514, 517 (7th Cir. 1997) (stating that "a state claim is independent of a CBA for preemption purposes 'as long as the state-law claim can be resolved without interpreting the agreement itself' " (quoting *Lingle v. Norge Div. Magic Chef*, 486 U.S. 399, 410 (1988))). McCoy also invoked the district court's federal question jurisdiction when he alleged that Maytag breached the CBA. *See generally Matter of Amoco Petroleum Additives Co.*, 964 F.2d 706, 709 (7th Cir. 1992) (stating that "[f]ederal law so dominates relations between employers and unions that the Supreme Court treats any attempt to interpret, enforce, or question a collective bargaining agreement as necessarily based on national law" (citing *Lingle*, 486 U.S. at 405-06)).

genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56. McCoy's retaliatory discharge claim is based on Illinois law. *See generally Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 358 (Ill. 1978) (recognizing for the first time a retaliatory discharge cause of action under Illinois law). "When resolution of an issue depends on state law, we must apply the law that would be applied in this context by the state supreme court." *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007). *See also Clark*, 473 F.3d at 712.

Under Illinois law, " '[a] valid claim for retaliatory discharge requires a showing that (1) an employee has been discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy.' " *Carter v. Tennant Co.*, 383 F.3d 673, 677 (7th Cir. 2004) (quoting *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) (citing *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992))). " 'In the workers' compensation context, a plaintiff must show (1) that he was the defendant's employee before his injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim.' " *Id.* (quoting *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 767 (7th Cir. 1994) (citing *Kritzen v. Flender Corp.*, 589 N.E.2d 909, 915 (Ill. 1992))). " 'The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee.' " *Id.* (quoting *Hartlein*, 601 N.E.2d at 728). An employer's discharge of an employee for filing a workers' compensation claim " 'is equally offensive to the public policy of this State as stated in the Workers' Compensation Act.' " *Id.* (quoting *Darnell v. Impact Indus., Inc.*, 473 N.E.2d 935, 937 (Ill. 1984)).

Some question remains, however, regarding whether, under the *Erie* doctrine, a federal court exercising diversity jurisdiction to hear a retaliatory discharge claim under the Illinois Workers' Compensation Act must apply the Illinois framework, or whether it may use the familiar burden-shifting method first presented in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Carter*, 383 F.3d at 678; *see also Bourbon*, 223 F.3d at 474-77 (Posner, J., concurring) ("If the requirement of proving cause is so attenuated as to give the plaintiff a boost toward winning his case that he would not have under ordinary rules of pleading and production, then there is a conflict with substantive state law, and what the federal courts inaptly call the *McDonnell Douglas* standard for proving retaliation must give way in any retaliation case governed by state law."). This is "of potential importance because while 'the Supreme Court of Illinois expressly rejected the application of *McDonnell Douglas* to Illinois retaliatory-discharge cases in *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407-08 (Ill. 1998),' " *Carter*, 383 F.3d at 677 (quoting *Bourbon*, 223 F.3d at 474 (Posner, J., concurring)), we previously have utilized the *McDonnell Douglas* framework, *see Hiatt v. Rockwell Int'l. Corp.*, 26 F.3d 761, 767 (7th Cir. 1994) (applying *McDonnell Douglas* framework to retaliatory discharge claim under Illinois law (citing *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59-60 (7th Cir. 1990))). As we noted in *Carter*, the Supreme Court of Illinois "was concerned that use of the *McDonnell Douglas* framework 'would, in essence, expand the tort of retaliatory discharge by' . . . reliev[ing] plaintiffs of their burden to prove as an element of their *prima facie* case under Illinois law a causal link between their workers' compensation claims and their discharge." *Carter*, 383 F.3d at 677-78 (quoting

*Clemons*, 704 N.E.2d at 408). Thus, to determine which framework should apply, we would need to examine whether the *McDonnell Douglas* framework is substantive or procedural when it is applied in this context. *Carter*, 383 F.3d at 678. If the *McDonnell Douglas* framework is substantive for *Erie* purposes, then we must apply the Illinois framework when a retaliatory discharge claim under the Illinois Workers' Compensation Act "wander[s] into federal court by virtue of . . . diversity jurisdiction." *Bourbon*, 223 F.3d at 474 (Posner, J., concurring). We did not resolve this uncertainty in *Carter*, because the parties waived the issue by ignoring it on appeal, and because the plaintiff's claim failed under either the Illinois framework or the *McDonnell Douglas* framework because the defendant "provide[d] a valid, non-pretextual reason for its decision to terminate" the plaintiff. *Carter*, 383 F.3d at 678. *See also Siekierka v. United Steel Deck, Inc.*, ___ N.E.2d ___, 2007 WL 1342223, at *6 (Ill. App. Ct. May 4, 2007) ("The mere existence of a valid or sufficient reason, however, does not defeat a retaliatory discharge claim. '[I]f an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees *and the trier of fact believes it*, the causation element required to be proven is not met.' " (quoting *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998) (emphasis added))); *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("The pretext inquiry focuses on the honesty—not the accuracy—of the employer's stated reason for the termination.") (citations omitted). We face a similar situation in this case, because neither party raised this issue on appeal,[9] and, as discussed

---

[9] Maytag did note in its response brief that the district court analyzed McCoy's claim under both the direct and indirect

(continued...)

below, Maytag provided a valid, non-pretextual reason for terminating McCoy's employment. Accordingly, as we did in *Carter*, we leave the decision regarding " 'what the *prima facie* case of retaliation is in the Seventh Circuit' " for another day. *Carter*, 383 F.3d at 678 (quoting *Bourbon*, 223 F.3d at 476 (Posner, J., concurring)).

Even assuming that McCoy could demonstrate a prima facie case of retaliatory discharge under either the Illinois framework or the *McDonnell Douglas* framework, McCoy's claim fails because Maytag has articulated a legitimate, nondiscriminatory reason for terminating McCoy's employment and McCoy has failed to show that Maytag's proffered reason was pretextual. *See Gomez v. The Finishing Co.*, 861 N.E.2d 189, 197-98 (Ill. App. Ct. 2006) ("If the employer is able to articulate a legitimate, nondiscriminatory reason for the employee's discharge, then the plaintiff has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true, but a pretext for discrimination."); *see also Tincher*, 118 F.3d at 1129 (stating that once an employer provides a legitimate, nondiscriminatory reason for terminating the employee, "the *McDonnell Douglas* framework 'drops out of the picture' leaving [the employee] with the ultimate burden of proving the discrimination by showing that [his employer] provided a pretextual reason for her termination") (citations omitted). Maytag has consistently argued that it discharged McCoy not because he filed a workers' compensation claim, but

---

[9] (...continued)
methods, but it did not take a position on whether the Illinois framework or *McDonnell Douglas* framework should control the case.

because he failed to provide Maytag with status reports regarding his medical condition every thirty days pursuant to Article 23 of the CBA and because he did not notify Maytag within forty-eight hours regarding his failure to return after his leave of absence expired pursuant to Article 13.5 of the CBA. McCoy counters that Maytag's stated reason for his termination was pretextual. To show pretext a plaintiff must offer evidence to indicate that the employer did not honestly believe the reasons it gave for its action and is simply lying to "cover [its] tracks." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005). *See also Gomez*, 861 N.E.2d at 197. In other words, pretext "means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Tincher*, 118 F.3d at 1129. *See also Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered reason is pretextual.").

In this case, there is ample evidence in the record that Maytag's decision to terminate McCoy's employment was based on its interpretation of the CBA's terms and its conclusion that McCoy's leave of absence had expired and he had abandoned his employment. McCoy claims that Maytag deliberately misread the CBA[10] as requiring him to

---

[10] McCoy contends that his injury was a "plant injury," and as such the CBA's thirty-day medical update requirement in Article 23 does not apply to him. He also asserts that Maytag engaged in a conspiracy to avoid paying workers' compensation expenses by tricking him into applying for A&S benefits rather than workers' compensation and then contriving a reason to termi-

(continued...)

submit medical status updates every thirty days as part of
a scheme to reduce its workers' compensation costs.
Whether or not Maytag "misread" the CBA's thirty-day
policy, it did not immediately enforce it against McCoy
when he initially ran afoul of it. Maytag's understanding
of the CBA is reflected in the certified letters that it sent
to McCoy prior to terminating his employment. Those
letters also evince that Maytag provided McCoy with a
chance to rectify his failure to submit timely medical
updates prior to taking action against him. Additionally,
all of the Maytag employees who were involved in Mc-
Coy's termination process—including Brasher, LeMay,
and McConnaughy—testified that they were operating
pursuant to this understanding of the CBA and in accord
with established Maytag policy. For instance, Brasher
testified that, "[i]n the most recent five years, [Maytag] has

---

[10] (...continued)

nate his employment. McCoy's contentions are not supported
by the record, which evinces that on the same day that
McCoy completed his A&S benefit form he also completed
and filed a separate workers' compensation application. While
Maytag initially disputed McCoy's workers' compensation
claim, McCoy and Maytag ultimately reached a lump-sum
settlement. Further, Maytag did not terminate McCoy's employ-
ment after he filed his workers' compensation claim, but
rather *seven months* later, and after it had been paying him A&S
benefits during that entire period. *See Fyfe v. City of Fort Wayne*,
241 F.3d 597, 603 (7th Cir. 2001) (stating that a lengthy time
between the events is insufficient proof of causation in the
absence of other causal links (citing *Hughes v. Derwinski*, 967
F.2d 1168, 1174-75 (7th Cir. 1992) (finding four months insuf-
ficient); *Juarez v. Ameritech Mobile Commc's, Inc.*, 957 F.2d 317, 321
(7th Cir. 1992) (finding six months insufficient)).

terminated 17 employees who failed to provide the Company updated medical information after being requested to do so." McConnaughy testified that the letter she sent to McCoy is a "standard letter" that she sends to "everyone in this situation." McCoy's union representative, Jones, testified that "it is not uncommon to see those letters with termination to follow them for a no call, no show, whether you're on comp or not." Finally, Brasher, McConnaughy, and union representative Jones each testified that under their understanding of the CBA, an employee must submit new medical documentation every thirty days, regardless of whether the employee had previously submitted documentation that purported to cover a period longer than thirty days, as McCoy's letters from Dr. Harryman did in this case. Thus, while Maytag's reading of the CBA may have been flawed, or even incorrect, and its communication between its employees certainly could have been better, there is no evidence in the record to support McCoy's conjecture that Maytag's decision to terminate his employment was part of a larger plot to drive down workers' compensation costs by targeting workers' compensation filers. In short, the record indicates that Maytag's employees believed they were carrying out an established policy without regard for whether McCoy had filed a workers' compensation claim, and that the fault for McCoy's termination (or failure to correct the alleged mis-application of the thirty-day medical update policy) lies solely with McCoy's failure to diligently pursue his rights under the CBA. We therefore find that Maytag articulated a legitimate, non-retaliatory reason for terminating McCoy, and McCoy failed to show that Maytag's reason was pretextual. Accordingly, we affirm the district court's grant of summary judgment to Maytag on McCoy's retaliatory discharge claim.

Next, McCoy argues that the district court erred in granting summary judgment on his claim that Maytag breached the CBA. Maytag countered, and the district court agreed, that McCoy's claim failed because he did not exhaust the CBA's grievance procedures prior to filing this lawsuit. McCoy concedes that he failed to comply with the CBA's grievance procedures, but contends that his failure should be excused.

It is well settled that if a CBA establishes a grievance and arbitration procedure for the redress of employee complaints, employees wishing to assert claims based on a CBA first must exhaust the grievance procedure before resorting to a judicial remedy. *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 616 (7th Cir. 2001) (stating that "[g]enerally, an employee must exhaust the CBA's grievance procedures before pursuing judicial remedies"). In this case, Article 8.5 of the CBA provides such a grievance and arbitration procedure:

> The Grievance Procedure and Arbitration provided for herein shall constitute the sole and exclusive method of determination, decision, adjustment or settlement between the Parties of any and all grievances as defined herein, and the Grievance Procedure and Arbitration provided herein shall constitute the sole and exclusive remedy to be utilized by the Parties hereto for such determination, decision, adjustment, or settlement of any and all grievances as herein defined.

CBA Article 8.5, vol. 3/5. While this provision would appear to prevent McCoy's claim, there are three exceptions in which a court may excuse an employee's failure to exhaust a CBA's grievance and arbitration procedure: (1) if "union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim"; (2) if

"internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301"; or (3) if "exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim." *Hammer v. UAW*, 178 F.3d 856, 858 (7th Cir. 1999) (citing *Clayton v. UAW*, 451 U.S. 679, 689 (1981)). Accordingly, we must determine whether McCoy's claim falls within any of these exceptions.

McCoy's brief does not clearly articulate upon which of the three exceptions he relies, although it appears that he is asserting the first exception because he argues that the union did not fairly represent him by declining to file a grievance on his behalf. Article 26 of the CBA provides that an employee who is discharged or suspended must notify the human resources department regarding any claim of wrongful discharge or suspension "within two (2) working days after such discharge or suspension." According to union representative Jones, Maytag occasionally waived the forty-eight-hour requirement if there was a mutual agreement or need for further investigation. McCoy, however, admittedly failed for approximately two months to notify both Maytag's human resources department and the union regarding his claims. When McCoy eventually did notify union representative Jones that he was interested in pursuing a grievance, Jones declined on grounds that McCoy's requested grievance was "far beyond 48 hours" and "untimely." We agree with the district court that the evidence shows that union representative Jones' decision not to pursue McCoy's grievance was motivated by McCoy's own neglect of the CBA's terms, rather than hostility or unfairness. McCoy attempts to explain away his late notice by claiming that his private attorney advised him "not to worry about the termination," despite the fact

that McCoy was party to a CBA that obligated timely notification. Unfortunately for McCoy, relying on advice from private counsel is not one of the three exceptions to the exhaustion rule. McCoy also may be asserting the second exception when he argues that it would have been futile for him to file a grievance because both Maytag and union representative Jones misinterpreted the CBA as requiring him to file a medical update every thirty days, despite the fact that his injury did not qualify as a "plant injury." Even if McCoy's allegation is correct and his grievance proved futile, his compliance with the grievance process would have permitted him a judicial recourse to correct the alleged error in interpreting the CBA. McCoy makes no discernable attempt to assert the third exception, thus we deem that argument waived. *See Hojnacki v. Klein-Acosta,* 285 F.3d 544, 549 (7th Cir. 2002) ("A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal."); *see also Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (stating that cursory and undeveloped arguments are deemed waived). Accordingly, we find no exception to the exhaustion rule and affirm the district court's grant of summary judgment to Maytag on McCoy's breach of contract claim.

III.

The district court did not err in granting summary judgment in favor of Maytag on McCoy's retaliatory discharge and breach of contract claims. McCoy's retaliatory discharge claim failed because Maytag articulated a legitimate, nondiscriminatory reason for terminating McCoy's employment, and McCoy failed to show that Maytag's proffered reason was a pretext. McCoy's breach

of contract claim failed because he did not exhaust his administrative remedies under the CBA prior to filing suit, and his claim did not meet any of the three exceptions to the exhaustion rule. Accordingly, the district court's judgment is AFFIRMED.

A true Copy:

    Teste:

                                 _____

                              *Clerk of the United States Court of*
                                   *Appeals for the Seventh Circuit*