In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 06-4304

LAVERNE TUBERGEN,

*Plaintiff-Appellant,*

v.

ST. VINCENT HOSPITAL AND HEALTH CARE CENTER, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Indiana.
No. 1:04-cv-01765-JDT-WTL—**John Daniel Tinder**, *Judge.*

---

ARGUED NOVEMBER 6, 2007—DECIDED FEBRUARY 21, 2008

---

Before FLAUM, KANNE, ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Laverne Tubergen alleges that St. Vincent Hospital and Health Care Center ("St. Vincent") discharged him on the basis of age, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"). The district court granted summary judgment in favor of St. Vincent, and we affirm.

## I. Background

Tubergen is a 65 year-old ear, nose and throat doctor. He has utilized his skills as a physician and a business

administrator[1] in a number of capacities, including work as an Army flight surgeon, a tenured professor, and an operator of a private business enterprise. From March 1997 through June 20, 2004, he was employed by St. Vincent under a contract as a Service Line Medical Director.

St. Vincent had what it referred to as a "service line" for each of the medical specialties that it provided. There were nine Service Lines in total. Each service line was characterized by dual leadership, in the sense that each was run by one physician, the Medical Director, and one nurse administrator, the Executive Director. The Medical and Executive Directors for a particular Service Line specialized in that area of clinical services. They were responsible for all of the business-related functions of their particular specialty, including operational budgets, strategic planning, clinical management, staffing and scheduling of employees, marketing, and employee relations. Medical Directors tended to be employed on a part-time basis, and focused more on physician management. Tubergen was employed as the Medical Director of the Surgical Specialities Service Line and the Musculoskeletal Service Line. Most recently, he was employed on a two-year contract for part-time employment set to expire on June 30, 2004. However, either party could prematurely terminate the agreement after ninety days' written notice.

In late 2002, St. Vincent realized that in order to remain competitive, it needed to streamline its operations and organizational structure with an eye towards becoming more efficient. In December 2002, it hired James Houser as its Chief Operating Officer with a mandate to improve operations. Houser had previous experience

---

[1] In addition to his M.D., Tubergen also holds an M.B.A.

with reorganizations and reductions-in-force ("RIF"). He hired two outside consulting firms and constructed a steering committee of twenty St. Vincent employees to help guide the analysis and implementation. Effectively, Houser had ultimate authority over the decisions that were made. At the outset, Houser hypothesized that the Service Line structure was an expensive way to run a hospital, and he held meetings with the various Service Line heads in order to discuss the issue. Dr. Michael Wiemann and nurse Jean Meyer, Medical and Executive Directors of the Oncology Service Line, requested a meeting with Houser to discuss the potential for reorganization. They were concerned about the possibility of losing their jobs, and they offered to help Houser with his project. As a result, he made them a part of his steering team. Tubergen never approached anyone about assisting with the reorganization because he believed that his Service Line was run well, and he generally believed in the system.[2]

After researching the issue, Houser concluded that the Service Line structure was inefficient in that it created redundant costs across various business functions. It turns out that running the hospital as nine mini-organizations made less sense than running it as one whole enterprise. Why, for instance, would you have nine groups independently working on a marketing strategy when this task could instead be consolidated across the various groups? Thus a central element of the RIF was that the Service Line management structure was to be abolished and clinical services were to be reorganized with an eye towards centralizing certain core business functions. The structure was replaced with a similar dual

---

[2] Tubergen did unsuccessfully apply for the position of hospital president.

leadership role that spread across the several clinical specialties as opposed to having a Medical and Executive Director for each specialty. The new Chief Medical Officer and Chief Nursing Officer positions were ultimately offered to Wiemann and Meyer. Several new positions were created that would report to these two officers. With respect to Tubergen's former job, his duties were divided between approximately 24 individuals. After certain positions were eliminated and others were created, Houser made the determinations as to who would fill the new positions.

The RIF eliminated over 300 positions in total. On June 20, 2003, St. Vincent communicated the results of the RIF to the various parties affected by it. Houser met in person with some of the individuals to let them know the news, including Tubergen, Cindy Leigh, Linda Hermann, and Mary Ann Scott. He told Tubergen that "this has nothing to do with your performance. Your job has been eliminated." He added that "we welcome you to review at any time the St. Vincent job posting and apply for any vacant position for which you are qualified." Tubergen did not apply for any of these new positions because, in his view, the efforts would have been futile as St. Vincent would not consider him seriously. Shortly after they were fired, Tubergen and Scott were discussing the situation, and Scott mentioned that Dr. Laws told her that Houser had told him that he was "getting rid of the old guard." Tubergen then spoke with Laws regarding this comment and Laws told him that Houser made the statement "with respect to the firing of [Scott, Hermann and Leigh]." Specifically, Laws recalled "sitting in [Houser's] office at a time before the RIF when [Houser] informed [Laws] that Mary Ann Scott was going to be terminated and it was the beginning of getting rid of the old guard." Further, Laws stated that the "context of the meeting was . . . what was going to happen to the

children's hospital personnel." Houser himself does not remember making the statement, but noted that if he did make it, "it was referencing structure, not people . . . it would have been in the context of a change in leadership . . . moving away from one model and into another model."

On December 5, 2003, Tubergen filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On August 2, 2004, he received his right to sue letter from the EEOC and then filed a complaint in the district court. He alleges that he was wrongfully terminated because of his age in violation of the ADEA. After discovery, the district court ruled in favor of St. Vincent and granted its summary judgment motion.

## II. Discussion

On appeal, Tubergen makes two separate but related arguments. First, he contends that the district court erred in determining that Houser's alleged ageist statements failed to give rise to a reasonable inference of age discrimination. Second, he maintains that the district court incorrectly concluded that he had failed to establish that any similarly situated, substantially younger employees received better treatment. We analyze each issue in turn.

## A

We review the district court's grant of summary judgment de novo. *Jackson v. County of Racine*, 474 F.3d 493, 498 (7th Cir. 2007). Summary judgment is appropriate when there are no genuine issues as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). While we construe all facts and reasonable infer-

ences in favor of the nonmoving party, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

The ADEA seeks to protect those over the age of forty from age discrimination in the workplace. A plaintiff suing under this statute may proceed with his case in one of two ways. The first avenue, dubbed the direct method, requires that the plaintiff adduce either "direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose . . . ." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d. 935, 938-39 (7th Cir. 2003). Circumstantial evidence can come in the form of suspicious timing or behavior, or evidence that younger but similarly situated employees received better treatment. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

The district court is correct in observing that there is no direct evidence that Tubergen was eliminated due to his age. Tubergen argues that the "old guard" comment was sufficient, at least at the summary judgment stage, to show direct proof of discrimination. However, the record indicates that Dr. Laws, who heard the comment, believed that the statement was made with regard to children's hospital staffing—an area where Tubergen did not work. To be sure, Tubergen's name was not mentioned in the conversation, nor was it used in a context that could include him.

Tubergen contends in the alternative that the statement provides circumstantial evidence of discrimination, particularly since it was made close to the time of his termination. It is pellucid, however, that the entire service line structure was revamped and all Medical Director positions were eliminated irrespective of age. Also, over 300 employees were eliminated as a part of the RIF,

which makes it highly unlikely that the comment was a reflection of age-based animus or that the RIF was a ruse to allow St. Vincent to rid itself of its senescent employees. Even if we exclude context for a moment, in a previous case, we held that "[n]o weight can be attached to an overheard comment that [the plaintiff] does not like to promote 'good old boys,' since any competent user of the English . . . language knows that to be a good old boy one need not be old, or for that matter good." *Lindsey v. Baxter Healthcare Corp.*, 962 F.2d 586, 588 (7th Cir. 1992). So too here, we know that members of the "old guard" need not be old.[3] The term's etymology, referring to the Imperial Guard of Napoleon I, and its definition, describing a conservative faction, lend credence to the idea that it ascribes a quality to a structure, not the individuals that compose it. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1224 (4th ed. 2000). This is consistent with how Houser explained his comments during his deposition. Furthermore, as we have already noted, the context in which the comment was made makes it even more unlikely that Houser was thinking about Tubergen at all, much less his age.

Independent of the "old guard" comment, Tubergen contends that younger administrators whose positions were eliminated received automatic consideration for employment under the new structure. But it is clear from the record that Houser and the consultants considered Tubergen for newly created positions. They determined that he was not the best person to fill these positions, and that he showed little interest in the new structure. Indeed, Tubergen did not even apply for any of the newly created positions.

---

[3] For completeness, we should note that they also need not be guards.

Tubergen also argues that other former Medical and Executive Directors obtained employment under the new structure while he did not. The district court is correct in concluding that Executive Directors are not appropriate comparators because these positions are filled by nurses, and they require a different educational background and skill set. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). With respect to the other medical directors, their attributes and outcomes do not help Tubergen's case. Only five of the individuals who held Medical Director positions remained with St. Vincent after the RIF. Only one of these five was more than ten years younger than Tubergen.[4] Yet two who were no longer employed after the RIF were more than ten years younger than Tubergen.

Tubergen maintains that the set of individuals whose outcomes we should examine should be larger than St. Vincent Medical Directors. He does not adequately explain why we should look beyond Medical Directors. But even if we examine the comparators that Tubergen urges us to use, he is still unable to make a claim. The first of these individuals, Gary Fammartino (age 47), was placed in a new vice president position charged with ordering medical products. He was previously a respiratory therapist. Tubergen was not considered for this position because it emphasized business expertise related to supply chain activities, which he did not possess. The second individual, Dr. Spanenburg (age 36), was retained as Case Management Medical Director. Tubergen simply asserts that he was better qualified for the job, but there

---

[4] Under the ADEA, in the case of younger employees that fall above the age of forty, the age difference must be ten years or greater in order to be presumptively substantial. *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 659 (7th Cir. 2001).

is no indication that St. Vincent held the same belief, which is what is most relevant. Further, this position was not available until after Tubergen was eliminated, and he did not apply for this (or any other) newly created job. The third individual, Dr. LeGrand (age 56), was appointed to the position of Chief of Surgery. This comparison is not useful because he is not substantially younger than Tubergen, and, again, the position was not created until after the initial job cuts. Finally, Dr. Roughraff (age 42), became Orthopedic Department Chair, which is unilluminating because it is an elected position.

Overall, the record reflects that Tubergen cannot employ the direct method to make a case for age discrimination. The "old guard" comment was made in reference to a completely different group of individuals—those working in the children's hospital—and was likely to refer to structure, as opposed to the age of the employees being eliminated. Moreover, many employees—both young and old—were eliminated and retained under the RIF. Finally, any of the comparators that Tubergen seeks to use as evidence of age discrimination are inapposite for the various reasons detailed above.

Tubergen could eschew the direct method and instead pursue his age discrimination claim through what we refer to as the indirect method. To proceed under this framework, Tubergen must prove that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of his protected class or were substantially younger were treated more favorably. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001). It is only the fourth prong that is at issue here, and we have articulated above why Tubergen cannot leap over this hurdle. In this restructuring context, St. Vincent was required to provide

its older employees with the same placement opportunities as it provided its younger employees who were subject to the RIF. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 615 (7th Cir. 2000). Crucially, if the older employee fails to take advantage of those opportunities, they foreclose any claim of discrimination. *Torry v. Northrup Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005).

Because Tubergen also did not put forth evidence that his failure to apply was caused by a discriminatory practice, St. Vincent is not required to offer a legitimate reason for its actions. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738-39 (7th Cir. 2006). Even so, St. Vincent does provide such a explanation: it sought to eliminate the entire Service Line structure in order to streamline its operations. Tubergen provides no reason to doubt the veracity of this claim, and it would be difficult for him to do so knowing that over 300 young and old employees were eliminated and many young and old employees were retained. He tries to argue that the strategy did not cut costs, but this Court's role is not to measure the success of a given strategy. We must simply ascertain whether St. Vincent believed that its restructuring efforts would attain its stated goals, and we see no reason to doubt that here.

### III. Conclusion

For the foregoing reasons, we AFFIRM the entry of summary judgment in favor of St. Vincent.