In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-1460

KITSY J. AMRHEIN,

*Plaintiff-Appellant,*

*v.*

HEALTH CARE SERVICE CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 C 3015—**Jeanne E. Scott**, *Judge.*

ARGUED NOVEMBER 26, 2007—DECIDED OCTOBER 20, 2008

Before BAUER, ROVNER AND WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* After being disciplined and ultimately terminated, Kitsy Amrhein sued her former employer, Health Care Service Corporation ("HCSC"), alleging that she had been discriminated against on the basis of her gender and that she was the victim of unlawful retaliation. The district court granted summary judgment for the defendant. Amrhein appeals, and for the reasons stated below, we affirm.

## I. BACKGROUND

Amrhein worked for HCSC from May 28, 1985 until her termination on March 1, 2004. In 1997, she was promoted to the position of group specialist in HCSC's Springfield Full Service Unit; she held this position until she was discharged. Group specialists at HCSC provide services to employer groups that have insurance through Blue Cross/Blue Shield. At the time that Amrhein was terminated, there were eight group specialists in her unit, including herself, six other women, and Scott Redpath. Redpath and Amrhein were promoted to group specialist at the same time. Amrhein was the primary contact for United Airlines and the secondary contact for Georgia Pacific; Redpath was the primary contact for Georgia Pacific and the secondary contact for United Airlines. Theresa Benner worked as the supervisor for Amrhein's unit; Benner reported to Jane Marquedant, who in turn reported to Karen Woods.

Beginning at the end of 2002, Amrhein formed an opinion that she and Redpath were not treated equally at HCSC. She felt that Redpath was assigned significantly less work than she was and that Redpath did not pull his weight with either the United Airlines or Georgia Pacific accounts. Amrhein let this opinion be known to several HCSC employees, including Benner.

In a performance review drafted by Benner and dated February 10, 2003, Amrhein received favorable marks for all competency areas, but only met the "targeted standard" with respect to contributions to team and technical quality. She received a 2% salary increase.

Amrhein did not think this review or the salary increase reflected the quality of her work, and she felt that she was being penalized for complaining about Redpath.

Over the following year, Amrhein was disciplined by HCSC on two separate occasions. Employees of HCSC were required to follow the HCSC Code of Conduct and Business Ethics Code. The Code forbade the misuse of corporate assets, which had been interpreted to include the overuse of company telephones for personal purposes. The Code also prohibited the disclosure of proprietary business information. HCSC monitored the quality of the group specialist's work with quality coordinators. The coordinators would randomly tape-record telephone conversations of group specialists and listen for violations of the Code.

During a taped phone conversation with a representative from a competing company in January 2003, Amrhein disclosed information that Karen Woods believed to be "proprietary business information." Amrhein divulged the amount of the fee HCSC charged its customers for a certain service, and further suggested that HCSC had not trained its employees on compliance with the Health Insurance Portability and Accountability Act. Amrhein was suspended without pay for five days and placed on probation. Amrhein claimed that there was nothing improper about the conversation, and that the real reason HCSC suspended her was that she had complained about her 2003 performance review.

A warning issued by Benner to Amrhein on December 2, 2003, indicated that her use of the telephone for personal

use was excessive; Amrhein did not believe her personal telephone use was particularly excessive and argued to Benner that Redpath's use exceeded her own, and that Redpath, who did not receive a warning, should have.

On December 8, 2003, Marquedant, Benner, and Amrhein met to discuss the telephone use and Amrhein's frustration regarding the warning. During that meeting, Amrhein stated that she felt she was being treated significantly less fairly than Redpath by Benner and HCSC. She also suggested that she might seek an EEOC mediator, or "file a complaint" in order to obtain one.

On December 12, 2003, Amrhein sent an e-mail to Marquedant regarding her treatment at HCSC. In the e-mail she discussed how her behavior and work product far exceeded that of Redpath, but that Redpath received preferential treatment. She stated that she felt that this amounted to "sexual discrimination." Also in the e-mail, Amrhein detailed a series of personal tragedies that she had experienced between June 2003 and December 2003. Her father passed away on June 9, 2003; her brother-in-law died unexpectedly on September 12, 2003, and her niece was hospitalized in November after expressing suicidal tendencies. Marquedant notified Woods and human resources representative Yvonna Cosey of Amrhein's concerns. Cosey investigated Amrhein's various complaints.

On January 14, 2004, Amrhein met with Cosey and Marquedant. Cosey informed Amrhein that she found no evidence of gender discrimination. Amrhein then expressed her intent to file a complaint with the EEOC; the

following day, Marquedant notified Benner and Woods of Amrhein's intent to file an EEOC claim.

On February 4, 2004, Woods sent an e-mail to her supervisor asking for help in addressing their "options" with Amrhein. Woods noted that Amrhein was a "huge challenge" and was "disruptive to the unit" and "costing us a huge amount of time and resources."

On February 18, 2004, Marquedant met with several group specialists, including Amrhein, to discuss new policies regarding the scheduling of personal time off or "PTO." During the meeting, Amrhein complained about the scheduling of her PTO, to which Marquedant responded that "if you wanted to schedule all of your days, you should not have made the complaint," and referenced Amrhein's "opening up a can of worms." The argument escalated quickly; witnesses characterized Amrhein's behavior in the meeting as argumentative.

Also in 2004, Marquedant, while monitoring Amrhein's calls for personal use, overheard Amrhein make what she judged to be an inappropriate disclosure. The call, which took place on January 14, 2004, was between Amrhein and Cathy Perricone, an employee of United Airlines. Amrhein suggested in that conversation that staff reallocation at HCSC had been due to the need for HCSC to meet "performance guarantees," which were contractual performance expectations that HCSC had to meet to avoid financial penalties. Marquedant notified Benner and Woods of her opinion that this disclosure violated the Code's confidentiality policy. After discussing various options, Cosey, Woods and Marquedant

made the decision to terminate Amrhein. Amrhein was notified on March 1, 2004 that she was terminated for (1) the Perricone conversation; and (2) insubordination at the February 18, 2004 meeting.

On January 25, 2005, Amrhein filed a two-count complaint against HCSC, alleging that HCSC had discriminated against her based on her gender in violation of 42 U.S.C. § 2000e-2(a) and had terminated her in retaliation for her efforts to oppose gender discrimination in violation of 42 U.S.C. § 2000e-3. On February 9, 2007, the district court granted HCSC's motion for summary judgment. This timely appeal followed.

## II. ANALYSIS

On appeal, Amrhein argues that the district court erred in finding that she failed to establish a prima facie case of retaliation. She did not appeal the grant of summary judgment on the gender discrimination claim. We review a district court's grant of summary judgment de novo. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Darst*, 512 F.3d at 907.

Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his

employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Amrhein could elect to prove her retaliation claim by using either the direct method or the indirect, burden-shifting method. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).

Under the direct method, she must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Id.*; *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007). Amrhein can rely on two types of evidence to show that her protected activity motivated HCSC's action: "direct evidence" or "circumstantial evidence." *Lewis v. School Dist. # 70*, 523 F.3d 730, 742 (7th Cir. 2008). Direct evidence is evidence "which (if believed by the trier of fact) will prove the fact in question without reliance upon inference or presumption," which typically involves an admission by the decision maker regarding the retaliatory intent. *Id.* (citation omitted). Because direct evidence of discriminatory intent is rare, a plaintiff can also offer circumstantial evidence, which "allows the trier of fact to *infer* intentional discrimination by the decisionmaker," typically through a longer chain of inferences. *Id.* (citation omitted and emphasis in original).

Amrheim did not produce direct evidence of retaliation, relying instead on circumstantial evidence. The primary

circumstantial evidence presented was the proximity between her stated intention to file an EEOC claim and her termination. Suspicious timing may be enough to meet the minimal burden of establishing a prima facie case, but suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506-07 (7th Cir. 2004); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Amrhein argues that the relevant time period is the six weeks between the January 14, 2004 meeting with Cosey and Marquedant and her termination on March 1, 2004. At that meeting, Amrhein stated that she intended to file a complaint with the EEOC, but Amrhein had voiced a similar intention at the December 3, 2003 meeting, almost three months before her termination. That period of time between the threat and the firing is not enough, on its own, to create a jury issue on the inference of retaliation. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000).

Amrhein argues that she presented more than just the suspicious timing, including (1) a "pattern" that developed among her supervisors of "act[ing] out against her when she complained about favorable treatment extended to Redpath"; (2) that her supervisors were "upset" about her intention to go to the EEOC, as evidenced by, *inter alia*, the e-mail from Woods; (3) that the Perricone conversation was an "excuse" to fire her; (4) that Marquedant exaggerated the extent of Amrhein's insubordination during the encounter on February 18, 2004; and (5) that HCSC did not follow its standard disciplinary processes in firing her. Amrhein did not raise this last point before the district

court in opposition to summary judgment, so we will not consider it. *Domka v. Portage County, Wis.*, 523 F.3d 776, 783 (7th Cir. 2008) (citing *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)). The remaining evidence falls short of establishing a prima facie case. The evidence that HCSC employees were "upset" at Amrhein for raising the EEOC claim is scant, and Amrhein fails to indicate how any other actions by HCSC employees reflected an intent to retaliate against her because she raised the EEOC complaint. In the course of the three months, Amrhein had several issues with her employer beyond the complaint, including the Perricone call and the insubordination. The evidence supporting the infer-ence that these actions, along with the other violation of the HCSC Code and the discipline for excessive tele-phone use, led to Amrhein's termination far outweighs any inference that Amrhein's stated intention to file an EEOC claim did.

Taken as a whole, the circumstantial evidence is far too speculative to amount to a triable issue.

Under the indirect method, an employee must establish a prima facie case by proving that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employ-ment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 784-85 (7th Cir. 2007). Once the prima facie case is established, the burden shifts to the employer to produce a non-discriminatory

reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual. *Id.* at 785.

Like the district court, we focus our attention on the "similarly situated" prong. A similarly situated employee need not be "identical," but the plaintiff must show that the other employee "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008); *Crawford v. Ind. Harbor Belt RR. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (holding that a similarly situated employee is one who is "comparable to plaintiff in all *material* respects").

The district court found that Amrhein did not establish a prima facie case because she did not identify any similarly situated employees that were not terminated. We agree. Amrhein presents Woods, Hall, and Redpath, but all of these employees differ from Amrhein in material respects, particularly in the disparity in their disciplinary history.

Amrhein argues that Woods disclosed confidential information to Perricone in a manner similar to Amrheim's disclosure and did not face similar punishment. Woods, a senior manager at HCSC, was three levels of management above Amrhein; Amrhein and Woods did not report to the same supervisor. Moreover, the offending conduct alleged by Amrhein, even if true, indicates that

Woods engaged in a single violative act, rather than the multiple incidents in Amrhein's employment history.

Next, Amrhein argues that Hall engaged in disruptive conduct on par with Amrhein's spat with Marquedant and received only a reprimand. Hall, a group specialist like Amrhein, dealt with the same supervisors and was subject to the same standards. There was no evidence showing that Hall had other conduct violations. Without a similar disciplinary history, Hall cannot be considered "similarly situated."

Which leaves us with Redpath, another group specialist, who had been previously disciplined for performance issues. Specifically, he had received a written warning and verbal counseling for excessive amounts of personal telephone calls. Amrhein also notes that he was alleged to have abused HCSC's policies regarding credit cards by failing to pay a bill on time. She argues that this second incident should be treated as another Code violation, which makes him comparable to her. That is not a logical conclusion or analogy.

So, Amrhein's prima facie case under the indirect method must also fail. But even if we were to assume that Amrhein presented a prima facie case of retaliation under either method, Amrhein failed to rebut HCSC's legitimate proffered reason for the termination. *See McCoy v. Maytag Corp.*, 495 F.3d 515, 522 (7th Cir. 2007). Amrheim stated that it fired Amrhein because she disclosed proprietary information in the Perricone conversation—a violation of the HCSC Code—and the insubordination with Marquedant. There is ample evidence in

the record that these events occurred, and they qualify as legitimate, nondiscriminatory reasons to discharge Amrhein. Amrhein fails to discredit these reasons as pretext.

## III. CONCLUSION

Accordingly, we AFFIRM the district court's grant of summary judgment.

ROVNER, *Circuit Judge*, dissenting. This is a very close case but one key piece of evidence, taken in context, demonstrates that a retaliatory motive may have played a part in Amrhein's termination. That evidence is Marquedant's statement to Amrhein that "if [she] wanted to choose all of [her] days [off], then [she] should not have complained in the first place," and that Amrhein had "open[ed] up a can of worms." The timing of those statements, uttered by a decision-maker in the termination, a few weeks after an internal investigation into Amrhein's charges of discrimination and her threats to go to the EEOC, a few weeks after another decision-maker complained that Amrhein was a "huge challenge" and costing the company time and resources, and a scant twelve days before the termination, imply a retaliatory

intent. Because of that evidence, I believe we should treat this as a mixed motive case, shifting the burden to the employer to demonstrate that it still would have terminated Amrhein for reasons other than retaliation. Because there is a genuine factual dispute regarding whether HCSC would have terminated Amrhein absent any unlawful motive, summary judgment should be vacated and the case should be remanded for trial.

Although timing helps Amrhein make her case, I agree with the majority that timing alone might not be enough to take the case to trial. It may be helpful to briefly recap events at the end of 2003 and the beginning of 2004, as Amrhein's troubles at work were escalating. In early December 2003, Benner issued Amrhein a warning about her personal telephone use. Amrhein complained that Redpath's personal telephone usage exceeded her own but he had not been similarly warned. Amrhein indicated she was considering filing a complaint with the EEOC. On December 12, 2003, Amrhein sent an e-mail to Marquedant complaining that Redpath was receiving preferential treatment even though he was far less productive than she, a difference she attributed to sex discrimination. Marquedant forwarded the e-mail to Cosey, a human resources representative, and Cosey conducted an internal investigation. On January 14, 2004, Cosey and Marquedant met with Amrhein to inform her that Cosey found no evidence of gender discrimination. They also presented her with a revised warning about her phone usage. Amrhein reiterated her intent to file a complaint with the EEOC. Marquedant conveyed this threat to Benner and Woods the next day. In late January, when

Amrhein learned she was not getting a pay raise, she reminded Marquedant of her intent to pursue a sex discrimination claim with the EEOC.

On February 4, 2004, Woods asked her supervisor for help in addressing their "options" with Amrhein because she was a "huge challenge" and was "costing [the company] a huge amount of time and resources." Only two weeks later, on February 18, 2004, Marquedant met with Amrhein and other group specialists to discuss the new policy for scheduling paid time off. When Amrhein questioned the policy because it did not allow her to take off all of the days she had accumulated, Marquedant, one of the decision-makers in the termination, told Amrhein that "if I wanted to choose all of my days, then I should not have complained in the first place[.]" Amrhein Dep. at 256. Marquedant, in the same meeting, "then went on to make reference to [Amrhein] 'opening up a can of worms.'" Amrhein Affidavit at ¶ 18. The record contains conflicting accounts of the tenor of this discussion, and on summary judgment, we must construe those accounts in Amrhein's favor. Amrhein (and others) denied that Amrhein raised her voice or was argumentative or engaged in insubordination.

Nonetheless, Amrhein was terminated approximately twelve days later for insubordination and for other infractions that the majority details. Two of the three decision-makers in the termination had recently made comments that could be construed as circumstantial evidence of retaliatory intent. *See Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473-74 (7th Cir. 2008) (under

the direct proof method, direct or circumstantial evidence that the employer's decision to take the adverse employment action was motivated by an impermissible purpose may suffice). Circumstantial evidence includes suspicious timing or behavior. *Tubergen*, 517 F.3d at 473-74. In my view, Marquedant's statements at the February 18 meeting indicated that she was not happy about Amrhein's complaints about discrimination. Woods' February 4th request for "options" to deal with Amrhein and a charge that she was costing time and resources came very soon after the company had expended time and resources conducting an internal investigation into Amrhein's charge of sex discrimination. Construing these circumstantial statements and events in Amrhein's favor, her employer appears to have been motivated at least in part by retaliation for complaining about gender discrimination. Moreover, the conflicting accounts of Amrhein's behavior at the February 18th meeting suggest that Amrhein was not insubordinate and that the charge of insubordination was a pretextual reason for the termination. *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999) (a plaintiff may demonstrate pretext with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge). True, Amrhein had also violated certain company policies, but it is unclear whether HCSC would have terminated Amrhein for those violations alone. An employer may well have a mixed motive, that is, more than one reason for firing an employee, but if the termination would not have

occurred but for the retaliatory intent of the employer, then the termination is unlawful. *Speedy v. Rexnord Corp.*, 243 F.3d 397, 401-02 (7th Cir. 2001); *McNutt v. Bd. of Trustees of Univ. of Ill.*, 141 F.3d. 706, 707-09 (7th Cir. 1998).

In a mixed motive case, an employer accused of retaliating against an employee for exercising her rights under Title VII may avoid liability by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the plaintiff's protected activity into account. *Speedy*, 243 F.3d at 401-02; *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 893-94 (7th Cir. 1996) (in the face of direct evidence of retaliation, the employer must ultimately establish, by a preponderance of the evidence, that it would have taken same action even if a desire to retaliate in no way tainted its decision making). Summary judgment will rarely be granted in a mixed motive case once the plaintiff has presented direct (including circumstantial) evidence that a forbidden factor contributed to the employer's decision to take an adverse action against the employee. *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n.12 (7th Cir. 1998). *See also Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997) (employee can prevail under Title VII so long as an illicit criterion played a motivating role in her discharge, even if another, legitimate criterion also played a role; once employee has presented direct evidence that a forbidden factor contributed to the termination, generally a trial will be required to determine whether the employer would have

taken the same action in the absence of that factor).[1] Unless the employer has presented undisputed evidence that it would have taken the same action in the absence of any retaliatory intent, summary judgment is inappropriate. Because HCSC has not produced that evidence here, because the claim of insubordination may be pretextual, and because the true motive for the discharge is in dispute, summary judgment should not have been granted here. For these reasons, I respectfully dissent.

---

[1] Moreover, Amrhein's inability to point out a comparable employee, one who had a similar disciplinary record and who was managed by the same supervisor, is not determinative in a direct evidence/mixed motive case. Although evidence of a comparable employee is considered helpful, it is not required. *Speedy*, 243 F.3d at 402-03.

---