NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 7, 2015[*]
Decided April 7, 2015

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 14-3392

| | |
|---|---|
| RUSI P. TALEYARKHAN, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Indiana, Hammond Division. |
| *v.* | |
| | No. 4:10cv39 |
| TRUSTEES OF PURDUE UNIVERSITY, | |
| *Defendant-Appellee.* | James T. Moody, |
| | *Judge.* |

**O R D E R**

Rusi Taleyarkhan, a tenured professor at Purdue University, sued the university alleging that sanctions ostensibly imposed for research misconduct were cover for discrimination based on his race and Indian national origin. Purdue's investigation of Taleyarkhan's controversial research into cold fusion received widespread attention. *See* Eugenie Samuel Reich, *Fusion Verdict: Misconduct*, NATURE (July 22, 2006),

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

http://www.nature.com/news/2008/080722/full/454379a.html (last visited Mar. 31, 2015); JR Minkel, *Bubble Fusion Researcher Charged with Misconduct*, SCIENTIFIC AMERICAN (July 21, 2008), http://www.scientificamerican.com/article/taleyarkhan-bubble-fusion-misconduct/ (last visited Mar. 31, 2015). The district court granted summary judgment for Purdue, and Taleyarkhan appeals. We affirm the judgment.

Except as noted, the following account is undisputed and presented in the light most favorable to Taleyarkhan, the party opposing summary judgment. *See Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). In 2003 Lefteri Tsoukalas, who was head of Purdue's School of Nuclear Engineering, recruited Taleyarkhan to join the university. While previously working at the Oak Ridge National Laboratory, Taleyarkhan and several scientists from other institutions had announced success in achieving sonofusion, or cold "bubble" fusion. Taleyarkhan's research became controversial when other scientists had difficulty replicating his observations. In 2005, though, a post-doctoral researcher and a graduate student at Purdue published two related papers claiming that they had confirmed Taleyarkhan's earlier work. Then in 2006 Taleyarkhan published another article (with the coauthors of his research at Oak Ridge) saying that the two Purdue scientists had vindicated him through independent research. Tsoukalas asked three professors to review these papers; the professors reported that Taleyarkhan, not the graduate student, may have been the real coauthor with the post-doctoral researcher. According to Taleyarkhan, the professors' report prompted Tsoukalas to cancel one of his classes, to remove his faculty biography from Purdue's website, and to subject him to "worldwide humiliation." Purdue denies imposing any sanctions as a result of Tsoukalas's informal inquiry.

Later that year Tsoukalas and another Purdue professor shared with the dean of the College of Engineering their suspicion that Taleyarkhan had engaged in research misconduct. An "inquiry committee" appointed by the dean then looked into the 2005 and 2006 publications but did not uncover sufficient evidence to justify recommending a formal investigation. Tsoukalas stepped down as head of the School of Nuclear Engineering in August 2006. By the spring of 2007, the university had received additional complaints of research misconduct from the Office of Naval Research (which was funding Taleyarkhan's research), a Congressional committee overseeing publicly funded research, and professors from Purdue and another university. In response, the dean of the College of Engineering appointed a second "inquiry committee." This second committee examined Taleyarkhan's mentorship of students and junior faculty, ultimately concluding that he was uncritical of his own data and not producing

scholarship commensurate with his experience. The committee recommended further investigation, and the dean appointed an "investigation committee" in November 2007.

In February 2008 that committee conducted a three-day hearing at which Taleyarkhan testified and was represented by counsel. Taleyarkhan presented evidence that Tsoukalas had made several disparaging remarks about his Indian ancestry before stepping down in August 2006. The committee released its report in April 2008 concluding that Taleyarkhan had engaged in two acts of research misconduct. First, the committee found, only one of the authors credited with writing the 2005 papers had participated in the data collection or experiments; Taleyarkhan had added the graduate student's name to those two papers, making it appear that the student had collaborated with the post-doctoral researcher to replicate Taleyarkhan's experiments. Second, the committee found, Taleyarkhan had concealed his own considerable involvement in the research, writing, and submission of those papers by not identifying himself as an author. Taleyarkhan compounded those acts of misconduct, the committee added, by later publicly describing the scientists' research as independent. An "appeal committee" upheld the investigation committee's findings and conclusions.

In August 2008 the provost informed Taleyarkhan of the university's sanctions for his research misconduct: He was stripped of his named professorship, prohibited from acting as a "major professor" for graduate students for three years, and not allowed to mentor graduate students without oversight. Relying on Purdue's investigation, the Office of Naval Research additionally prohibited Taleyarkhan from receiving federal research funds for three years. As a result of the Navy's prohibition, Purdue had to reassign some of Taleyarkhan's projects to other professors and staff.

In May 2010 Taleyarkhan filed this pro se action claiming discrimination in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e-2, and intentional and negligent infliction of emotional distress. During discovery Taleyarkhan served Purdue with several requests to admit factual and legal matters. *See* FED. R. CIV. P. 36(a); N.D. IND. L.R. 26.1. Purdue at first objected that each request was overly broad and unduly burdensome. On Taleyarkhan's motion, however, a magistrate judge ruled that Purdue's "broad, boilerplate objections" were insufficient and ordered the university to "submit complete responses," which Purdue did.

In granting summary judgment for Purdue, the district court concluded that it could not consider the alleged adverse actions occurring in 2006 (which Taleyarkhan characterized as creating a hostile work environment) because none of those actions had

occurred within 300 days of Taleyarkhan's administrative complaint submitted to the Equal Employment Opportunity Commission. *See* 42 U.S.C. § 2000e-5(e)(1); *Adams v. City of Indianapolis*, 742 F.3d 720, 729–30 (7th Cir. 2014). Taleyarkhan does not challenge this conclusion on appeal.

As for the adverse actions resulting from the university's investigation and sanctions in 2008, the district court concluded that Taleyarkhan could not prevail under the direct method or indirect method. First, the court reasoned, Tsoukalas's derogatory remarks about Taleyarkhan's national origin were irrelevant because Tsoukalas had not been part of, or involved in appointing, the investigation committee that had found Taleyarkhan guilty of misconduct. The court also concluded that Taleyarkhan's circumstantial evidence—that most members of Purdue's investigation committee were white and the committee did not always follow university policy in discharging its duties—could not reasonably support the conclusion that Purdue's sanctions were discriminatory. Moreover, the court continued, Taleyarkhan's discrimination claim also failed under the indirect method because, even assuming a prima facie case of discrimination, the university had a legitimate, nondiscriminatory reason for sanctioning him. The investigation committee had verified acts of research misconduct, the court explained, and a jury could not reasonably conclude that the committee's findings were pretextual. Finally, the court concluded, Taleyarkhan's supplemental claims of intentional and negligent infliction of emotional distress were barred because he did not give Purdue advance notice, as required by the Indiana Tort Claims Act. *See* IND. CODE § 34-13-3-10.

On appeal Taleyarkhan first argues that the district court should not have disregarded Tsoukalas's derogatory statements; Taleyarkhan insists that there is a genuine factual dispute about whether Tsoukalas caused the investigation leading to him being sanctioned by the university. A plaintiff can prevail under the "cat's paw" theory of employment discrimination if he can show that an employee with discriminatory animus caused an unwitting decision-maker to take adverse action. *See Matthews v. Waukesha County*, 759 F.3d 821, 829 (7th Cir. 2014); *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012). But there is no evidence of causation in this case. Tsoukalas prompted the appointment of the *first* inquiry committee in 2006, but that committee effectively exonerated Taleyarkhan; Tsoukalas had no role in the second inquiry committee or the investigation committee that found evidence of misconduct in 2008. At all events, the investigation committee independently *substantiated* Tsoukalas's initial suspicion, so whatever motive he had for contacting the dean—even unlawful animus—was irrelevant. *See Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th

Cir. 2011); *Martino v. MCI Commc'n Servs., Inc.*, 574 F.3d 447, 452–53 (7th Cir. 2009); *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917–20 (7th Cir. 2007).

Taleyarkhan next argues that he should have prevailed at summary judgment because, on his understanding, the magistrate judge had "deemed as admitted" all of his requests for admission evaded initially by Purdue. Failing to answer or object to a request for admission deems the request admitted. *See* FED. R. CIV. P. 36(a)(3); *Nautilis Ins. Co. v. Reuter*, 537 F.3d 733, 741 (7th Cir. 2008). What the magistrate judge actually concluded, though, is that Purdue's blanket objection to Taleyarkhan's requests was inadequate, and thus the magistrate judge compelled Purdue to answer those requests or provide specific objections. As the district court recognized, the magistrate judge had never deemed Taleyarkhan's requests admitted.

Lastly, Taleyarkhan challenges the district court's conclusion that his tort claims are barred because he did not give Purdue appropriate notice. Tort claims against state universities in Indiana are barred unless notice is filed with the governing body within 180 days after the loss occurs. IND. CODE § 34-13-3-8; *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 648–49 (2006), *overruled in part on an unrelated ground by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013); *Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 869 (Ind. App. 1999). Taleyarkhan did not dispute that he never served the board of trustees with notice of his tort claims. *See* IND. CODE § 34-13-3-10. He insists that Purdue had notice of his tort claims in February 2009 through his administrative charge to the EEOC. But the EEOC charge would have given Purdue notice only of Taleyarkhan's Title VII claim. It did not alert the university that he intended to sue for negligent and intentional infliction of emotional distress. Accordingly, we agree that Taleyarkhan's EEOC charge was insufficient to put the university on notice of his tort claims and he did not otherwise notify the defendant of his claims within 180 days after the loss occurred in August 2008.

AFFIRMED.